MAXON CORPORATION and Commercial Union Assurance Companies, Appellants (Plaintiffs Below),

v.

TYLER PIPE INDUSTRIES, INC., Appellee (Defendant Below),

and

Tyler Corporation and Tyler Pipe Industries of Texas, Inc., Nominal Appellees (Defendants Below).

No. 2–1083–A–389.

Court of Appeals of Indiana, Second District.

Sept. 15, 1986.

Rehearing Denied Oct. 21, 1986.

Jim A. O'Neal, Scott A. Smith, Ice Miller Donadio & Ryan, Indianapolis, for appellants.

William H. Vobach, Julia M. Blackwell, Richard M. Knoth, Locke Reynolds Boyd & Weisell, Indianapolis, for appellee Tyler Pipe Industries, Inc.

SULLIVAN, Judge.

Maxon Corporation and its insurer, Commercial Union Assurance Companies,[1] appeal from the Marion County Superior Court's summary judgment which determined that Tyler Pipe Industries, Inc., Tyler Corporation, and Tyler Pipe Industries of Texas, Inc.[2] were not obligated to indemnify Maxon for payments it made in settlement of a suit by a Tyler employee who was injured by machinery manufactured by Maxon.

On appeal, Maxon presents the following issues:

(1) Whether the trial court erred in concluding as a matter of law that the "Warning and Covenants" section of Maxon's invoice containing an indemnity provision was not a part of Maxon's contract with Tyler; and

(2) Whether the trial court erred in concluding as a matter of law that even if the "Warning and Covenants" section of Maxon's invoice *was* a part of the parties' contract, it does not state in clear and unequivocal terms that Tyler must indemnify Maxon for Maxon's own culpability.

We affirm.

In early May of 1973 Maxon submitted a price quotation to Tyler Pipe for the sale of two "pre-mix blower-mixer" units for Tyler's Texas plant. Tyler then sent Maxon an order for the purchase of the two units. The reverse side of Tyler's order included the following pertinent terms and conditions:

"1. AGREEMENT No conditions inserted by the Seller in acknowledging and accepting this Order shall be effective if in conflict with terms and conditions herein stated unless such conditions inserted are accepted in writing by the Buyer.

\* \* \* \* \* \*

5. WARRANTIES The Seller warrants that all articles or materials delivered hereunder shall be free from defects of material or workmanship and guarantees all parts will conform strictly to specifications or drawings specified. The warranties of the Seller together with its service warranties and guarantees shall run to the Buyer or its customers. All warranties herein shall be construed as conditions as well as warranties.

\* \* \* \* \* \*

SPECIAL INSTRUCTIONS

\* \* \* \* \* \*

(4) THE SELLER, upon shipment of any or all of the material on this order, agrees to all of the terms, conditions and obligations as set forth." Record at 287.

Having received Tyler's order, Maxon shipped the two units. An invoice, which apparently accompanied the shipment, provided in part:

---

1. Hereafter we will refer to both Maxon Corporation and Commercial Union Assurance Companies simply as Maxon.

2. Tyler Corporation and Tyler Pipe Industries of Texas, Inc. are only nominal parties to this appeal.

"WARRANTY SELLER WARRANTS THE GOODS MANUFACTURED BY IT TO BE FREE FROM DEFECTS IN MATERIAL AND WORKMANSHIP AND TO CONFORM WITH THE SPECIFICATIONS IN SELLER'S CURRENT PUBLISHED TECHNICAL DATA, WHEN PROPERLY INSTALLED, CAREFULLY OPERATED AND CAREFULLY MAINTAINED. IF WITHIN ONE YEAR FROM SHIPMENT ANY OF THE GOODS FAILS TO SO CONFORM, OR IS FOUND TO HAVE BEEN DEFECTIVE IN MATERIAL OR WORKMANSHIP WHEN SHIPPED, SUCH DEFECTIVE GOODS SHALL, AT SELLER'S OPTION, EITHER BE REPAIRED OR REPLACED BY SELLER, F.O.B. MUNCIE, INDIANA, OR SELLER SHALL REFUND THE PURCHASE PRICE. (THE WARRANTY PERIOD FOR TRIP RELEASE VALVES AND MAXON–OKADEE VALVES SHALL BE ONE YEAR FROM INSTALLATION, BUT NO LONGER THAN 18 MONTHS FROM SHIPMENT BY SELLER.) IN ANY SUCH EVENT BUYER'S REMEDIES SHALL CONSIST EXCLUSIVELY AND SOLELY OF THOSE ABOVE STATED. THERE ARE NO WARRANTIES, EXPRESSED OR IMPLIED, OF MERCHANTABILITY OR OF FITNESS. SELLER SHALL HAVE NO LIABILITY TO BUYER FOR ANY DIRECT, INDIRECT OR CONSEQUENTIAL DAMAGES OR INJURY RESULTING FROM ANY DEFECTIVE OR NON–CONFORMING GOODS.

WARNING & COVENANTS THE IMPROPER INSTALLATION OR APPLICATION OF THE GOODS; THEIR USE WITH IMPROPER WIRING, PIPING, OR VENTILATION; IMPROPER SYSTEM DESIGN OR ENGINEERING; INADEQUATE INSPECTION OR TESTING; THE LACK OF REGULAR CAREFUL MAINTENANCE OF BOTH THE GOODS AND ANY EQUIPMENT IN CONNECTION WITH WHICH THE GOODS ARE USED; THE EMPLOYMENT OF INSUFFICIENT OR UN-QUALIFIED PERSONNEL; THE LACK OF CAREFUL SUPERVISION, PROPER WARNINGS, OPERATING INSTRUCTIONS, AND SAFETY PRECAUTIONS; THE EXPOSURE OF THE GOODS TO EXCESSIVE HEAT, MOISTURE, DUST, DIRT, CORROSION, OR ANY OTHER DELETERIOUS CONDITION, EACH CONSTITUTES A HAZARD WHICH CAN RESULT IN LOSS OF LIFE, SERIOUS PERSONAL INJURY, HEAVY PROPERTY OR BUSINESS DAMAGE, AND BUYER AGREES WITH SELLER TO ITSELF TAKE AND REQUIRE OTHERS TO TAKE ALL REASONABLE MEASURES TO AVOID EACH SUCH HAZARD. IN THE EVENT OF ANY SUCH LOSS, INJURY OR DAMAGE, BUYER SHALL NOT ITSELF, NOR PERMIT OTHERS TO, DISMANTLE, TEST OR EXAMINE ANY OF THE GOODS WITHOUT GIVING SELLER SUFFICIENT ADVANCE NOTICE TO BE PRESENT AND ALLOWING SUCH PRESENCE. BY ACCEPTANCE OF THE GOODS, BUYER AGREES TO INDEMNIFY SELLER AGAINST ALL LIABILITY, LOSS, COST AND EXPENSE ARISING OUT OF ANY CLAIM OF ANY NATURE INVOLVING THE USE OR MISUSE OF THE GOODS, INCLUDING, BUT NOT LIMITED TO ANY ALLEGED OR ACTUAL NEGLIGENCE, BREACH OF WARRANTY, DEFECT OR DEFICIENCY IN THE GOODS, THEIR DESIGN, OR APPLICATION, OR IN ANY DRAWING, SERVICE SUGGESTION, WARNING, INSTRUCTIONS OR OTHER LITERATURE.

ENTIRE AGREEMENT ANY DOCUMENT SUBMITTED BY BUYER MODIFYING, ADDING TO, OR INCONSISTENT WITH THE TERMS AND PROVISIONS HEREIN CONTAINED, SHALL BE DEEMED ACCEPTED BY SELLER ONLY ON THE CONDITION THAT THE LIABILITIES OF SELLER SHALL BE DETERMINED SOLELY BY THE TERMS AND CONDITIONS ABOVE SET OUT, AND IN CONSUM-

MATING ANY SUCH ORDER, SELLER SHALL BE DEEMED NOT TO HAVE CHANGED, ENLARGED, OR MODIFIED ITS LIABILITIES OR OBLIGATIONS AS ABOVE SET OUT. THIS DOCUMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDES ALL PRIOR STATEMENTS OF ANY KIND BY OR BETWEEN THE PARTIES. ACCEPTANCE OF THE GOODS SHALL CONSTITUTE CONCLUSIVE ACCEPTANCE OF THESE TERMS AND CONDITIONS." Record at 11 (emphasis in original).

After Tyler installed the two "pre-mix blower-mixer" units, one of them exploded, injuring a Tyler employee. The employee sued Maxon in the Federal District Court for the Eastern District of Texas,[3] and though Tyler was not named as a party to the action, Tyler did have notice of the suit and declined to defend. Maxon and its insurer then filed this suit seeking indemnification from Tyler for their $600,000 settlement with the injured employee.[4]

Following pre-trial discovery, Tyler filed a summary judgment motion. After a hearing on Tyler's motion, both parties were granted leave to file additional authority in support of their positions.[5] The trial court's judgment in favor of Tyler stated in pertinent part:

## "ENTRY

This cause was submitted for hearing on May 16, 1983 on the motion of defendants Tyler Pipe Industries Inc. and Tyler Pipe Industries of Texas, Inc. for summary judgment. The parties appeared by their respective counsel and argument was heard. The court having considered the pleadings, answers to interrogatories, admissions, affidavits, arguments and briefs of counsel, and having taken the matter under advisement, finds certain facts undisputed and capable of only one inference, and states its conclusions of law thereon as follows:

\*　　\*　　\*　　\*　　\*　　\*

11. That the shipment of the two pre-mix blower-mixers on June 27, 1973, constituted an acceptance by Maxon of the offer extended by Tyler Pipe through its purchase order.

12. That regardless of whether or not Invoice No. 73–10014 became a part of the contract between Tyler Pipe and Maxon, the term and condition titled 'Warning and Covenants' on the reverse side of the invoice constituted a proposed

---

3. The employee's complaint alleged in part that the machinery sold to Tyler was "not reasonably fit for the purposes or uses for which it was intended," that it was "unreasonably dangerous," and that Maxon "was negligent in the design, manufacture, production and inspection" of that machinery. Record at 156–166.

4. The settlement agreement indicated that the employee's suit was based upon "the doctrine of common law negligence, breach of warranty and/or doctrine of strict liability." Record at 185.

5. The record demonstrates that Tyler was apparently served with Maxon's brief in opposition to Tyler's summary judgment motion on the day of the hearing. Consequently, the trial court on May 16, 1983, made the following entry:

"Plaintiff by counsel. Defendant by counsel. Argument heard on defendant's motion for summary judgment, taken under advisement. Defendants have 20 days to respond to plaintiff's brief, defendant [sic] to have time to reply." Record at 337.

Thereafter, on June 6, 1983, Maxon filed an affidavit by its Vice President, William L. Pingry, in an effort to show a prior course of dealing between Tyler and Maxon. Tyler contends that Maxon's affidavit was not properly before the trial court, inasmuch as Indiana Rules of Procedure, Trial Rule 56(C) states, "The adverse party *prior to the day of hearing* may serve opposing affidavits." (Emphasis supplied.)

Maxon, on the other hand, contends that because Tyler failed to object to the affidavit in its reply brief in support of its motion for summary judgment, Tyler may not now object to that affidavit on appeal, *citing Buttz v. Warren Machine Co.* (1914) 55 Ind.App. 347, 103 N.E. 812.

While we have some reservations about whether the Maxon affidavit was indeed properly before the trial court, we agree with Tyler that in light of the contents of the affidavit the issue is without legal significance. For the sake of argument, therefore, we will assume the affidavit was properly before the trial court.

additional term which materially altered the terms and conditions of Tyler Pipe's offer.

13. That the term and condition titled 'Warning and Covenants' did not become a part of the contract between Tyler Pipe and Maxon.

14. That regardless of whether or not the term and condition titled 'Warning and Covenants' became a part of the contract between Tyler Pipe and Maxon, the language contained therein which is the basis for Maxon and Commercial Union's claims for indemnification, does not state in clear and unequivocal terms that Tyler Pipe is to provide indemnity to Maxon for Maxon's own culpability.

15. That Tyler Pipe did not agree to indemnify Maxon for Maxon's own culpability in connection with the purchase and sale of the pre-mix blower-mixers.

16. That there was no course of dealings between Maxon and Tyler Pipe Industries of Texas Inc. sufficient upon which to base a claim for indemnity by Maxon and Commercial Union.

17. That the law is with the defendants Tyler Pipe Industries Inc. and Tyler Pipe Industries of Texas Inc. and against the plaintiffs Maxon Corporation and Commercial Union Assurance Companies.

18. That there are no genuine issues as to any material fact, and there being no just reason for delay, defendants Tyler Pipe Industries Inc. and Tyler Pipe Industries of Texas Inc. are entitled to a final judgment as a matter of law." Record at 381–384.

From the facts summarized it is clear that in some respects this is a classic "Battle of the Forms." On the other hand, in light of the singular nature of the "contractual" clause at issue, it is also a case of first impression for this court. At the outset, however, we are compelled to address a more mundane topic—the applicable standard for granting a summary judgment motion.

Indiana Rules of Procedure, Trial Rule 56(C) states in part:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits and testimony, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In addition, it has been held that

"even if the facts are not in dispute, summary judgment is not appropriate *when the information before the court reveals a good faith dispute as to the inferences to be drawn from those facts.*" *Hayes v. Second National Bank of Richmond* (1978) 1st Dist. 176 Ind. App. 299, 302, 375 N.E.2d 647, 650 (emphasis supplied).

"On the other hand, despite conflicting facts and inferences on some elements of a claim, summary judgment may be proper where there is no dispute or conflict regarding a fact that is dispositive of the litigation." *Letson v. Lowmaster* (1976) 3d Dist., 168 Ind.App. 159, 161, 341 N.E.2d 785, 787.

Maxon contends that it was Tyler's burden, as movant for summary judgment, to establish that no genuine dispute exists as to any material fact. Maxon asserts that

"the trial court based its ruling that Maxon's indemnification clause materially altered the Maxon-Tyler Pipe contract solely upon the literal language of Maxon's invoice and Tyler Pipe's purchase order. In particular, Tyler Pipe submitted *no* evidence to the trial court, whether by affidavit, deposition or otherwise, demonstrating what the parties to that contract intended or expected the terms of that contract to be. In fact, the *only* such evidence submitted to the Court was introduced by Maxon and Commercial Union—through the unobjected-to affidavit of William Pingry—which established that Maxon had used the identical invoice form, containing identical indemnity language, in at least *three* prior sales of pre-mix blower-mixer units to Tyler Pipe." Appellant's Brief at 24 (emphasis in original).

While we agree that the motion's proponent bears the burden of showing that there is no genuine issue of material fact, Tyler could have done so in one of two ways—either by asserting facts which if undisputed by Maxon would have demonstrated that as a matter of law the movant was entitled to summary judgment, or by conceding the undisputed facts as set forth by Maxon and demonstrating that it was nonetheless entitled to a judgment as a matter of law. Tyler, then, could have satisfied its burden by simply acknowledging that there was no dispute over which forms were used and by conceding that Maxon's invoice had apparently been used on previous occasions. It would then have been the trial court's responsibility to apply the law to the undisputed facts of the case.

Both parties concede that the applicable law is § 2–207 of the Uniform Commercial Code. This section is codified at I.C. 26–1–2–207 and provides in pertinent part as follows:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants[6] such terms become part of the contract unless:

\* \* \* \* \* \*

(b) they materially alter it...."

■ Thus, the law is clear that if Maxon's indemnity clause constituted a material alteration, it did not become a part of the contract between Tyler and Maxon. If the indemnity clause was not a material alteration, it became a part of the contract by operation of 2–207(2). Tyler argues that

Maxon's indemnity clause was a material alteration as a matter of law. Maxon argues that the question of whether the indemnity clause is a material alteration is a question of fact incapable of determination by means of summary judgment.

Maxon argues that the indemnity clause in its invoice was not a material alteration because Tyler was not surprised by or unaware of the provision. Maxon contends that the fact that the parties had exchanged the same forms on prior occasions gives rise to an inference that Tyler was aware of the indemnity clause.

Maxon's reliance on the prior course of dealings between the parties is, in this case, misplaced. In *Product Components v. Regency Door and Hardware, Inc.* (S.D. Ind.1983) 568 F.Supp. 651, 655, the court stated:

"A prior course of dealing may be used to 'give particular meaning to and supplement or qualify terms of an agreement.' § 1–205(3). To serve this end, however, the course of dealing must fairly 'be regarded as establishing a common basis of understanding for interpreting [the parties'] expressions and other conduct.' § 1–205(1)."

■ An exchange of identical forms on prior occasions does not, of itself, establish a common basis of understanding. In *Lockheed Electronics Co., Inc. v. Keronix, Inc.* (1981) 114 Cal.App.3d 304, 312–13, 170 Cal.Rptr. 591, 594, the California Court of Appeals considered and rejected an argument identical to that advanced by Maxon.

"Plaintiff has cited to us no place in the record, nor have they stated any facts even without citation to the records relating to the prior conduct of the parties, that shows that LEC's terms and conditions actually applied to the parties' dealings and performance. LEC's mere written attempt to substitute their own terms and conditions for Keronix's by virtue of a written statement in their

---

**6.** Maxon and Tyler agree that they are "merchants" as that term is defined in Ind. Code

26–1–2–104(1) (Burns Code Ed.1974).

acceptance to that effect, is insufficient to establish a course of conduct and to negate the effects of § 2207."

■ The California court's rationale is applicable here. There are no facts indicating that a Tyler employee had previously read an identical invoice, or that a previous dispute had called Tyler's attention to the indemnification clause. Facts identical to the exchange of forms which precipitated the present litigation do not permit a reasonable inference of awareness.

Parenthetically and conversely, we would also be unwilling to conclude that Tyler's hypothetical repeated use of an order stating that

"[n]o conditions inserted by the Seller in acknowledging and accepting this Order shall be effective if in conflict with terms and conditions herein stated unless such conditions inserted are accepted in writing by the Buyer"

would support an inference that *Maxon* was aware of Tyler's objection to conflicting terms and that Maxon therefore had consciously waived any right to enforce the additional conflicting terms of its invoice. The use or repeated use of such forms implies nothing about the parties' awareness of their contents, inasmuch as such forms "are all too often never read." *Products Components, supra,* 568 F.Supp. at 654. Indeed, it was precisely this reality which § 2–207 recognizes.

Even assuming that the prior exchanges of forms created the inference Maxon suggests, the argument nevertheless is unavailing. It is based upon a misinterpretation of Official Comment 4 to U.C.C. § 2–207. The official comment states:

"Examples of typical clauses which would normally 'materially alter' the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: a clause negating such standard warranties as that of merchantability or fitness

for a particular purpose in circumstances in which either warranty normally attaches; a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable."

Maxon would have us focus upon the element of surprise. However, the comment clearly "suggests that any term is a material alteration if its incorporation into the contract without express awareness by the other party would result in surprise *or* hardship." 2 Hawkland, Uniform Commercial Code Series 107 (1984) (Emphasis supplied). Thus, even if Tyler was not surprised by the indemnity clause in Maxon's invoice, the clause is nevertheless a material alteration if its incorporation without Tyler's express awareness would result in hardship.

■ There can be no doubt that Maxon's indemnity clause would impose serious hardship if incorporated without Tyler's express awareness. By its very nature, a clause which shifts liability from a negligent party to an innocent party imposes hardship.[7] Accordingly, we hold that Maxon's indemnity clause constitutes a material alteration as a matter of law.

Our decision that such a broad indemnification clause constitutes a material alteration as a matter of law is not without precedent. Although this is a question of first impression in this state, the Wisconsin Court of Appeals has had opportunity to examine a similar indemnity clause in an invoice which accompanied the delivery of an automatic screw machine.

"The language in question, if effective, would shift to Frantz all liability for any claims arising from operation of the ma-

---

**7.** "[C]ourts disfavor such indemnification clauses because it is a *harsh burden* to obligate one party to pay for the negligence of the other party." *Ogilvie v. Steele by Steele* (1983) 3d Dist.Ind.App., 452 N.E.2d 167, *citing Indiana State Highway Commission v. Thomas* (1976) 2d Dist., 169 Ind.App. 13, 346 N.E.2d 252 (emphasis supplied).

chine. As this lawsuit demonstrates, the potential monetary effect of such a shift is significant.... We hold as a matter of law that the indemnification provision in this case is ... a material alteration." *Resch v. Greenlee Bros. and Co.* (Wis.Ct. App.1985) 128 Wis.2d 237, 244, 381 N.W.2d 590, 593.

Other courts, though not faced with a question regarding an indemnification clause, have also found that certain provisions will constitute material alterations as a matter of law. *See Coastal Industries, Inc. v. Automatic Steam Products Corp.* (5th Cir.1981) 654 F.2d 375; *Johnson Tire Service, Inc. v. Thorn, Inc.* (Utah 1980) 613 P.2d 521; *Fairfield Noble Corp. v. Pressman-Gutman Co.* (S.D.N.Y.1979) 475 F.Supp. 899.

■ Although the somewhat clinical and arcane commercial considerations which we have discussed control disposition of this case, elements of unconscionability and public policy are also involved.

Indiana Code 26–1–2–302(1) (Burns Code Ed.1974) states:

"If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."[8]

Comment 1 notes in part:

"The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract."

We note that most cases involving unconscionability involve disadvantaged consumers. White and Summers, *supra*, at § 4–2. However, I.C. 26–1–2–302 is by no means limited to unsophisticated consumers. When, as here, the imposition of a broad indemnification clause is attempted without the express assent of the proposed indemnitor, and when that clause is placed in relative obscurity on the back of an invoice, it is unconscionable.

In *Weaver v. American Oil Co.* (1971) 257 Ind. 458, 276 N.E.2d 144, American Oil Company leased a filling station to Howard Weaver pursuant to a lease which included a clause requiring Weaver to indemnify the company for any negligence by the company occurring on the leased premises. The lease apparently was not read by Weaver although he signed it once a year during several preceding years. Our Supreme Court stated: "Had this case involved the sale of goods it would have been termed an 'unconscionable contract' under sec. 2–302 of the Uniform Commercial Code...." *Id.*, 276 N.E.2d at 146. While noting the disparity in the parties' bargaining positions, the court observed that "[t]he evidence also reveals that *the clause was in fine print* and *contained no title heading* which would have identified it as an indemnity clause." *Id.*, 276 N.E.2d at 147 (emphasis in original). Ultimately the court concluded:

"We do not mean to say or infer [sic] that parties may not make contracts exculpating one of his negligence and providing for indemnification, but it must be done *knowingly* and *willingly* for that very purpose." *Id.* at 148 (emphasis in original).

*See also Vernon Fire & Casualty Insurance Co. v. Graham* (1975) 166 Ind.App. 509, 336 N.E.2d 829. In this case, Maxon's indemnification language appears in one sentence at the end of a long passage titled "warning and covenants," the first two-thirds of which deal with installation and maintenance. Imposition of such a harsh term under these circumstances amounts to procedural unconscionability, *see Hahn v. Ford Motor Co., Inc.* (1982) 2d Dist.Ind. App., 434 N.E.2d 943, *citing* White and

---

**8.** The language of subsection 1 apparently allows the court to consider the issue of unconscionability *sua sponte.* White and Summers, *supra* at § 4–3.

Summers, *supra* at § 4–3; and while there may have been no disparity in the bargaining positions of Tyler and Maxon, we perceive no controlling distinction. Imposing such a clause upon a disadvantaged party who knows not what he signs and guilefully imposing it upon a party through the unilateral use of an invoice at or after the time the product is delivered represents a distinction without a material difference.

In addition to the unconscionable aspects of Maxon's invoice, we are also concerned with the public policy implications of imposing such an all-inclusive indemnification clause in the manner Maxon proposes. We note that the settlement for which Maxon seeks indemnification is one which entailed strict products liability claims.[9] Indiana Code 34–4–20A–3(a) (Burns Code Ed.Supp. 1985) states:

"One who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to his property *is subject to liability for physical harm caused by that product to the user* or consumer or to his property *if that user* or consumer *is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition,* and if:

(1) The seller is engaged in the business of selling such a product; and

(2) The product is expected to and does reach the user or consumer without substantial alteration in the condition in which it is sold by the person sought to be held liable under this chapter." (Emphasis supplied.)

▮ It is clear that one purpose of the statute is to deter manufacturers from producing products which are unreasonably dangerous to foreseeable users. *See Rosado v. Proctor & Schwartz, Inc.* (1985) 66 N.Y.2d 21, 494 N.Y.S.2d 851, 484 N.E.2d 1354. This purpose is accomplished through the imposition of liability upon the defective product's manufacturer for injuries that result from the malfunction of the product. A contractual scheme that seeks to require indemnification by the product's ultimate user for physical injury to that ultimate user undermines the effectiveness of the statute. Thus, it has been held that:

"[t]o allow a manufacturer ... to shift the ultimate duty of care to others through boilerplate language in a sales contract, would erode the economic incentive manufacturers have to maintain safety and give sanction to the marketing of dangerous, stripped down, machines." *Rosado, supra,* 494 N.Y.S.2d at 855, 484 N.E.2d at 1348.

Furthermore, Indiana's Product Liability statute is a codification of the common law of products liability which had been adopted in this state. *Whittaker v. Federal Cartridge Corp.* (1984) 3d Dist., Ind. App., 466 N.E.2d 480, 482. In turn, "the common law was essentially an adoption of the Restatement 2d of Torts § 402A." *Id., citing Cornette v. Searjeant Metal Products, Inc.* (1970) 147 Ind.App. 46, 258 N.E.2d 652. Section 402A, Comment c states:

"On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; *that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained;* and that the consumer of such products

---

**9.** Although the employee's suit was founded upon Texas products liability law, inasmuch as Maxon would enforce its indemnification clause by invoking Indiana law, we consider this state's products liability statute to be sufficiently implicated to warrant our discussion of the public policy underlying Indiana products liability.

is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products." (Emphasis supplied.)

Our assessment of the public policy implications of the indemnification clause is given some substance by existing laws regulating indemnification in the construction industry. For example, Ind. Code 26–2–5–1 (Burns Code Ed.Supp.1985) states:

"All provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction or design contract except those pertaining to highway contracts, which purport to indemnify the promisee against liability for:

(1) death or bodily injury to persons;

(2) injury to property;

(3) design, defects; or

(4) any other loss, damage or expense arising under either (1), (2) or (3); from the sole negligence or wilful misconduct of the promisor's or the promisee's agents, servants or independent contractors who are directly responsible to the promisee, are against public policy and are void and unenforceable."

■ While we need not decide today that Indiana public policy prohibits a manufacturer from obtaining a blanket indemnification from its buyer for personal injuries to the buyer's employees due to the manufacturer's own negligence,[10] we do hold that our public policy at the very least requires that such an obligation be entered into only with the explicit, prior consent of the buyer under circumstances which demonstrate a lack of procedural or substantive unconscionability.

■ Maxon correctly and steadfastly maintains that it was Tyler's burden in moving for summary judgment to demonstrate that the indemnification clause materially altered the contract between the parties. However, in light of our holding that the indemnification clause was a material alteration as a matter of law, the burden was satisfied by the inclusion of Tyler's order and Maxon's invoice in the record for the consideration of the trial court. Because the indemnification clause in the invoice was, as a matter of law, a material alteration, it did not, as a matter of law, become a part of the contract.

■ Additionally, we note that while the material alteration could have become a part of the contract if the parties had expressly agreed to its inclusion,[11] Maxon has not argued that Tyler expressly agreed to the additional terms in Maxon's invoice. This is apparent from the fact that Maxon concedes that this dispute "presents a classic application of § 2–207 of the Uniform Commercial Code...." Appellants' Brief at 20. The applicable provisions of 2–207 create an acceptance of additional or different terms *by operation of law*, unless the additional terms materially alter the offer. Thus, if there had been an express agreement between Tyler and Maxon to the terms contained in Maxon's invoice, the transaction would have been removed from the ambit of 2–207. There is no need to create an acceptance by operation of law when there is already an express agree-

---

**10.** Our caution in this regard is based in part upon the realization that in some instances a manufacturer might be unable to obtain independent liability insurance. Under such circumstances, a buyer should have the freedom to agree to indemnify the manufacturer. Otherwise, products essential to the buyer and of genuine value to society might become unavailable. Ind. Code 26–2–5–2 (Burns Code Supp.1985) illustrates this point:

"This chapter [26–2–5–1, 26–2–5–2] does not apply to a construction or design contract if liability insurance normally available within the United States at standard rates cannot be obtained for the facility being constructed or designed because it constitutes a dangerous instrumentality."

**11.** Official Comment 3 to U.C.C. § 2–207 provides,

"Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party." *See also Resch, supra,* 381 N.W. 590, 593 ("There should be an express agreement between the parties concerning [a material alteration's] inclusion or exclusion."); *Fairfield Noble Corp., supra,* 475 F.Supp. 899, 902.

ment between the parties. Maxon's argument is not that Tyler expressly agreed to the terms of its invoice, but that those terms became a part of the contract by operation of law because they did not constitute a material alteration. Thus, Tyler was under no burden in its motion for summary judgment to prove that it had not expressly agreed to the material alteration.

Finally, Maxon alleges that the trial court erred in concluding as a matter of law that the indemnification clause "does not state in clear and unequivocal terms that Tyler Pipe is to provide indemnity to Maxon for Maxon's own culpability." Maxon acknowledges that

> "the standard to be applied is whether the contract containing the indemnification clause was 'knowingly and willingly' entered into by Maxon and Tyler Pipe, or as the courts of this State have alternatively held, whether the indemnification clause 'clearly and unequivocally' provides that Tyler Pipe shall indemnify Maxon for losses arising out of Maxon's own culpability. *Norkus v. General Motors Corp.* (S.D.Ind.1963) 218 F.Supp. 398; *Loper v. Standard Oil Co.*, (1965) 138 Ind.App. 84, 211 N.E.2d 797." Appellants' Brief at 7.

Maxon then recites the allegations of the employee's complaint and asserts that the invoice is sufficient to require indemnification for those claims. Maxon relies primarily upon *Sink & Edwards, Inc. v. Huber, Hunt & Nichols, Inc.* (1984) 1st Dist.Ind. App., 458 N.E.2d 291, which upheld an indemnification clause stating:

> "Subcontractor further specifically obligates himself to contractor in the following respects:
>
> \*   \*   \*   \*   \*   \*
>
> To indemnify contractor and save it harmless from any and all claims, *suits or liability resulting from any act* or omission *of* subcontractor, or *contractor* or their officers, agents, employees, or servants in any manner related to the subject matter of this Subcontract, in-

cluding, without implied limitation, claims, suits or liability for injury to, or death of, persons, including the employees of either *contractor* or subcontractor and for damage to property...." 458 N.E.2d at 394 (emphasis supplied).

Maxon argues that "[i]f the indemnification clause at issue in *Sink & Edwards* was 'clear and unequivocal' as to the indemnitee's own wrongdoing, the clause at issue herein *must* also meet that test." Appellants' Brief at 41 (emphasis in original). Maxon asserts that "only one entity could possibly be responsible for the injury causing events listed therein, that being Maxon." *Id.*

As stated in *Jones v. City of Logansport* (1982) 3d Dist.Ind.App., 436 N.E.2d 1138, 1143, "[t]he meaning of a contract is to be determined from an examination of all its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone." In addition, "[t]he test for determining whether a contract is ambiguous is whether reasonable men would find the contract subject to more than one interpretation." *Tastee-Freez Leasing Corp. v. Milwid* (1977) 3d Dist. 173 Ind.App. 675, 678, 365 N.E.2d 1388, 1390.

A careful reading of Maxon's "warning and covenants" clause reveals that it begins with a series of admonitions to the buyer to properly install, wire, ventilate, integrate with other components, inspect, test, maintain, operate, supervise, and protect the "pre-mix blower-mixer" units. Only after this litany of warnings does the provision then state:

> "BY ACCEPTANCE OF THE GOODS, BUYER AGREES TO INDEMNIFY SELLER AGAINST ALL LIABILITY, LOSS, COST AND EXPENSE ARISING OUT OF ANY CLAIM OF ANY NATURE INVOLVING THE USE OR MISUSE OF THE GOODS, INCLUDING, BUT NOT LIMITED TO, ANY ALLEGED OR ACTUAL NEGLIGENCE, BREACH OF WARRANTY, DEFECT OR DEFICIENCY IN THE GOODS,

THEIR DESIGN, OR APPLICATION...."

Nowhere in the provision does Maxon say with any specificity comparable to the indemnification provision in *Sink & Edwards* that Tyler must indemnify even for liability incurred through the "negligence of the manufacturer." In turn, in light of the preceding series of admonitions to Tyler regarding its conduct in utilizing the machinery, and in light of the phrase "use or misuse" which could only refer to Tyler's conduct, the invoice's reference to "alleged or actual negligence" could reasonably be understood to apply to liability arising from Tyler's integration of the "pre-mix blower-mixer" units into its operation. Although "breach of warranty" could only be committed by Maxon, such does not mean that "use," "misuse" or "application" necessarily refer to Maxon alone. Neither are we willing to hold that "alleged or actual negligence" necessarily is susceptible to only one reasonable interpretation.

In sum, when viewed in the context of the invoice itself and the surrounding circumstances, Maxon's indemnification clause simply does not justify the conclusion that it clearly and unequivocally required Tyler to indemnify Maxon for Maxon's own culpability. Thus, even if we were to hold that Maxon's indemnification provision had become part of the parties' agreement, it was not clear and unequivocal so as to preclude summary judgment for Tyler.

The judgment of the trial court is affirmed.

MILLER, J. (participating by designation), concurs.

SHIELDS, J., concurs in result with opinion.

SHIELDS, Judge, concurring in result.

I concur in the majority opinion to the extent it finds the indemnification clause is unconscionable and violates public policy.